UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| JANE DOE,<br>          Plaintiff,<br><br>v.<br><br>CASCADE CHARTER TOWNSHIP, ET AL.,<br>          Defendants. | No. 1:18-cv-988<br><br>HON. PAUL L. MALONEY |

## OPINION

The Boy Scouts of America run a career education program called "BSA Exploring." The program is designed to expose young people to career opportunities and allow them to observe and interact with people engaged in employment that interests them.

Plaintiff Jane Doe participated in the Exploring program in Cascade, Michigan by shadowing employees of the township's fire department. She alleges that she was sexually abused, harassed, and molested by employees of the fire department during her participation in the program. She has raised claims against Cascade Township under 42 U.S.C. § 1983 for violation of her constitutional rights. She has also raised claims against the BSA for negligence, vicarious liability, and gross negligence. The only claims now at issue are those raised against the BSA Defendants[1], as these defendants have filed a motion to dismiss pursuant to Rule 12(b)(6).

---

[1] The BSA Defendants are (1) Boy Scouts of America, a Texas corporation (2) Michigan Crossroads Council, Inc., Boy Scouts of America, a Michigan Corporation and (3) Learning for Life, a Washington D.C. non-profit corporation. The Court follows the parties lead in referring to this trio as the BSA Defendants.

1

Because Plaintiff has not pleaded facts which give rise to a plausible claim for relief, the motion will be granted.

I.   **Factual Allegations[2]**

Beginning in 2016, Plaintiff Jane Doe began participating in the BSA Exploring program through one of the BSA's partner organizations, the Cascade Charter Township Fire Department.

Participation in the Exploring program is regulated by the BSA, which has established various guidelines and procedures for supervising and administering the program. For instance, the Program prohibits Explorers (program participants) from being alone with an adult during program activities, requires "two-deep" leadership, and has mandatory reporting procedures where abuse or improper behavior is suspected.

Enforcement of the BSA's guidelines and regulations falls to "Post Advisors." Post advisors are adults acting in a voluntary capacity to oversee a particular branch of the BSA Exploring program. The Post Advisors for Cascade were Jan Fair, Matt Groesser, John Makuch, John Porter, John Shipley, and Mary Shipley. Each of these individuals was subject to a background check conducted by the BSA before they were approved as a Post Advisor. And they were responsible for coordinating with officials at the Cascade Fire Department to ensure that BSA policies and guidelines were followed.

Plaintiff alleges that several of BSA's policies and guidelines were ignored or otherwise not enforced at the Fire Department. For example, Explorers were not supposed

---

[2] The following facts are alleged in Plaintiff's First Amended Complaint and must be taken as true for purposes of Defendants' Rule 12 motion.

2

to spend more than two hours per day at the Fire Department, nor were they supposed to be present at the firehouse after 8:00 p.m. According to Plaintiff, she spent approximately 30 hours per week at the firehouse during the Summer of 2016 and often stayed until 9:00 or 10:00 p.m. Plaintiff also spent much of her time at the firehouse in one-on-one situations with individual employees of the fire department, without supervision from any of the Post Advisors.

Two firefighters in particular began to pay special attention to Plaintiff: Clem Bell and Steven Drake. Plaintiff was frequently alone at the firehouse with these full-time, on-call employees while they taught her the techniques and skills that were required to be effective firefighters. And both men pursued social relationships with Plaintiff by obtaining her contact information and connecting with her social media accounts. Outside of the fire department, Drake encouraged Plaintiff to work for his landscaping business. Bell enlisted Plaintiff—a minor—to serve as his campaign manager in his bid for elected office as the Clerk of Cascade Township. These social contacts were also against BSA Policy, which prohibited "close social relationships" between adults and program participants.

By June 2016, other employees within the fire department noticed the special attention Bell paid to Plaintiff. Andrew Marsman, another firefighter in the Department raised his concerns to Deputy Fire Chief (and Post Advisor) John Shipley, informing Shipley that Bell's behavior gave the appearance of impropriety. Shipley then confronted Bell, who denied any inappropriate behavior. Bell claimed that he was trying to make Jane "feel valuable" and ensure she received quality training. Shipley warned Bell to keep his distance but did not take other steps to safeguard Plaintiff.

Not more than one month later, in July 2016, both Bell and Drake separately began initiating sexually charged conversations with Plaintiff. On July 2nd or 3rd, Drake initiated a sexual conversation with Jane while they were alone at the firehouse during work hours. Within a week, Drake engaged in sexual abuse, harassment, and forced touching of Jane while they were alone in an isolated part of the firehouse for 45 minutes. Bell's improper behavior escalated around the same time. He, too, initiated inappropriate sexual conversations with Jane. Near the end of July, he took Jane to close a county park at night. During this trip, he engaged in sexual touching of Jane. Then, in August 2016, Bell took Jane to the Clerk's office—which was attached to the firehouse—and engaged in further sexual contact with her. Both Drake and Bell also used cellphones to communicate with Jane and to send and receive explicit sexual images.

The inappropriate relationships continued for several months. In November 2016, another firefighter, Lance Korhorn noticed that Bell and Jane could not be found during a work shift. He reported his observation to his supervisor, Lieutenant Stevenson. The pair eventually found Bell and Jane by forcing open a locked office in the county building adjacent to the firehouse.

The following day, Stevenson warned Bell that it did not "look good" for him to be locked in an office alone with a minor. Korhorn also reported Bell's behavior to the Fire Chief, John Sigg. Sigg and Stevenson coordinated a meeting with Bell, which took place six days later on November 10, 2016. In the meeting, Bell promised that he would not be alone with Jane in the future. At no point in this process did anyone in the Fire Department alert Jane's parents, the BSA, or law enforcement. Nor did Sigg or Stevenson talk to Jane.

4

On November 12, Marsman again alerted Stevenson that Bell and Jane were not acting appropriately. This time, Jane had been following Bell around the Fire Department and wearing his coat. Stevenson warned Bell the following day, repeating that Bell was not supposed to be around Jane. Stevenson elevated his concerns to Fire Chief Sigg, but Sigg took no further action until November 17, 2016.

On that date, Chief Sigg met with the Post Advisor and Committee Chairman Matt Groesser. Sigg notified Groesser of Bell's behavior and the perception of other firefighters in the Department that Bell was maintaining an inappropriate relationship with Plaintiff. Sigg, Stevenson, and Groesser met again on December 7, 2016 to again discuss their concerns and the "uncomfortable feeling" that the department had toward Bell because of his relationship with Jane. The trio planned a meeting with Jane to talk about what occurred, but the meeting never happened.

On December 13, 2016, Jane disclosed to her parents that Drake and Bell had initiated sexual relationships with her. Around the same time, and without knowledge that Jane had disclosed to her parents, Chief Sigg, Groesser, and Stevenson continued to communicate about Jane.

Eventually, Kent County opened an investigation into Drake and Bell. On May 1, 2017, both men pleaded guilty to various crimes for their conduct involving Jane Doe. In the aftermath, Shipley was terminated and Fire Chief Sigg retired. Cascade Township Manager Ben Swayze blamed the abuse on "significant deficiencies in the policies and procedures of how the Explorer program was managed." The Explorer program was also suspended.

Finally, Plaintiff alleges that, nationwide, at least 137 girls and 26 boys have been similarly harmed within the Explorer program since its inception seventy years ago.

## II.     Legal Framework: Motion to Dismiss

A complaint must contain a short and plain statement of the claim showing how the pleader is entitled to relief. Fed. R. Civ. P. 8(a)(2). The complaint need not contain detailed factual allegations, but it must include more than labels, conclusions, and formulaic recitations of the elements of a cause of action. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A defendant bringing a motion to dismiss for failure to state a claim under Rule 12(b)(6) tests whether a cognizable claim has been pled in the complaint. *Scheid v. Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434, 436 (6th Cir. 1988).

To survive a motion to dismiss under Rule 12(b)(6), the plaintiff must provide sufficient factual allegations that, if accepted as true, are sufficient to raise a right to relief above the speculative level, *Twombly,* 550 U.S. at 555, and the "claim to relief must be plausible on its face" *Id.* at 570.  "A claim is plausible on its face if the 'plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 369 (6th Cir. 2011) (quoting *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations omitted). If the plaintiff does not "nudge[] [his] claims across the line from conceivable to plausible, [his] complaint must be dismissed." *Twombly*, 550 U.S. at 570.

6

When considering a motion to dismiss, a court must accept as true all factual allegations, but need not accept any legal conclusions. *Ctr. for Bio-Ethical Reform,* 648 F.3d at 369. The Sixth Circuit has noted that courts "may no longer accept conclusory legal allegations that do not include specific facts necessary to establish the cause of action." *New Albany Tractor, Inc. v. Louisville Tractor, Inc.,* 650 F.3d 1046, 1050 (6th Cir. 2011). However, "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need *detailed* factual allegations"; rather, "it must assert *sufficient* facts to provide the defendant with 'fair notice of what the . . . claim is and the grounds upon which it rests.'" *Rhodes v. R&L Carriers, Inc.,* 491 F. App'x 579, 582 (6th Cir. 2012) (citing *Twombly,* 550 U.S. at 555) (emphasis added).

### III. Discussion

#### A. General Negligence

Count Two of Plaintiff's Complaint raises a claim for negligence against the BSA Defendants. The elements of such a claim under Michigan law are a (1) duty, (2) breach of that duty, (3) causation, and (4) damages. *Brown v. Brown,* 739 N.W.2d 313, 316–17 (Mich. 2007).

The BSA Defendants assert that Plaintiff's negligence claim fails as a matter of law because they did not owe a duty to protect her from the specific harm alleged. In turn, Plaintiff offers several theories for how the Defendants owed her a legal duty of care. She says that BSA (1) voluntarily assumed the duty by administering the Explorers program; (2) had a special relationship to her because of the Explorers program; (3) had a duty attendant to its supervision of her because of her status as a minor; or (4) that public policy

considerations auger in favor of the imposition of a duty. However, the Court does not find that Michigan law supports Plaintiff's position, and thus, concludes that the Rule 12 motion must be granted as to Plaintiff's general negligence claim.

First, Michigan law imposes a duty upon persons who voluntarily assume a function that they are under no legal obligation to assume. For example, where a troop leader volunteered to give several Boy Scouts a ride home, the Michigan Court of Appeals concluded that he assumed a duty to perform the function—transportation to each scout's home—as an ordinarily prudent person would. *Terrell v. LBJ Electronics*, 470 N.W.2d 98, 100 (Mich. Ct. App. 1991). Accordingly, the *Terrell* court reversed the trial court's grant of summary disposition because there were questions of fact as to whether the troop leader had acted as an ordinarily prudent person to protect one of the scouts as he exited the vehicle and was struck by an oncoming vehicle. *Id.* Notably, *Terrell* involved only a limited duty; the court held that the driver had a duty to protect his passengers from the negligence of oncoming drivers by discharging his passengers in a reasonably safe place. *Id.* The court thus did not examine whether the troop leader's duty extended to criminal acts of a third party.

In *Babula v. Robertson,* the Michigan Court of Appeals examined the interplay between a babysitter's voluntary assumption of a duty and the criminal conduct of a third party. 536 N.W.2d 834 (Mich. Ct. App. 1995). There, a child was molested by her babysitter's husband. The child's mother sued the babysitter on a theory that the babysitter had voluntarily assumed a duty of care by agreeing to watch over the child. The Michigan Court of Appeals agreed that the babysitter had "assumed control over the child's safety, and thus had a duty to use reasonable care in ensuring the child's well-being was not endangered."

8

*Id.* at 838. However, the court held that the criminal conduct by the babysitter's husband—who had no history of criminal misconduct or sexual deviance—was "wholly unforeseeable" to his wife and thus concluded that the general duty of care she had assumed "did not extend to the specific harm done in the immediate case." *Id.* at 838–39.

*Babula*'s holding is consistent with the general rule in Michigan that there is no legal duty to protect a person from the unforeseeable crimes of a third party. *Brown v. Brown*, 739 N.W.2d 313, 317 (Mich. 2007). "The rationale underlying this general rule is the fact that '[c]riminal activity, by its deviant nature, is normally unforeseeable.'" *Graves v. Warner Bros.*, 656 N.W.2d 195, 200 (Mich. Ct. App. 2002) (quoting *Papadimas v. Mykonos Lounge*, 176 Mich.App. 40, 46–47, 439 N.W.2d 280 (1989)).

However, there is an exception to the rule where there exists a special relationship between the parties because one party has entrusted their safety to another. *Id.* For example, innkeepers, common carriers, and employers have a special relationship with their guests, passengers, and employees, such that they have a duty of reasonable care to those parties who are "readily identifiable as [being] foreseeably endangered. *Graves*, 656 N.W.2d at 201 (quoting *Mason v. Royal Dequindre, Inc.*, 455 Mich. 391, 397, 566 N.W.2d 199 (1997)). As the Michigan Supreme Court explained, the exception exists because "[i]n each situation one person entrusts himself to the control and protection of another, with a consequent loss of control to protect himself. The duty to protect is imposed upon the person in control because he is best able to provide a place of safety." *Williams v. Cunningham Drug Stores, Inc.*, 429 Mich. 495, 498–499, 418 N.W.2d 381 (1988). Accordingly, *Babula* is consistent with the special relationship doctrine in the sense that the babysitter assumed a limited duty to protect

9

the child from foreseeable danger, including foreseeable criminal acts; however, the court held that the child was not foreseeably endangered merely by being in proximity to the babysitter's husband who had not demonstrated any propensity to engage in conduct harmful to the child. *Id.* at 838–39.

The lesson of *Babula* is readily applicable here, because even if the BSA Defendants bore a duty to use reasonable care in ensuring that Plaintiff's safety was not endangered, they did not bear a duty to protect Plaintiff from the unforeseeable criminal activity of Drake and Bell. Plaintiff has not alleged any facts which would have put the BSA Defendants on notice that either Drake or Bell would engage in intentional criminal acts—either through their possession of child pornography or their alleged sexual assaults of Plaintiff.[3]

Other cases involving the "special relationship" exception confirm this result. In *Brown v. Brown,* the Michigan Supreme Court concluded that an employee's repeated, crude, and sexually explicit comments directed at a contractor and reported to the employer were not sufficient to make his subsequent rape of the contractor foreseeable, and thus, there was no duty of care. *Id.* In other words, even if an employee had potentially caused a sexually hostile work environment, an employer "can assume that its employees will obey [Michigan's] criminal laws." *Id.* at 318.

On the other hand, an employer's notice of an actual threat to commit rape would trigger the duty. *See Mueller v. Brannigan Brothers Restaurants and Taverns, LLC,* 918

---

[3] Nor is Plaintiff's attempt to couch the acts of Bell and Drake as "merely tortious sexual activity,"—as opposed to a criminal act—persuasive. Plaintiff has pleaded that she was forced into nonconsensual touching by both Drake and Bell. Therefore, Plaintiff's complaint clearly states that Drake and Bell committed sexual assault, regardless of the crimes to which they pleaded guilty. Plaintiff cannot walk away from those allegations or cast them as "tortious" conduct simply because it causes complications with her theories of liability as to BSA.

10

N.W.2d 545, 552 (Mich. Ct. App. 2018) (citing *Brown*, 739 N.W.2d at 313); *Cf. id.* (concluding that employee's decade-old misdemeanor charge of attempted assault on a police officer did not place employer on notice prior to employee's vicious beating of an ejected patron).

One last case bears discussion on this point. In *Boman v. Catholic Diocese of Grand Rapids*, the Michigan Court of Appeals concluded that a school was not liable for negligence where its tutor engaged in a sexual relationship with a 15-year-old student. No. 338458, 2018 WL 3129703, at *4 (Mich. Ct. App. June 26, 2018). The *Boman* court cited the rule of *Babula* and *Brown* that the existence of a duty depends on reasonably foreseeable harm and concluded that the tutor's sexual abuse of the student was not reasonably foreseeable despite the school's knowledge that the tutor was "too friendly towards male students" and "could be a danger" to the students. *Id.* Here, Plaintiff claims that the harm she suffered was reasonably foreseeable under precisely the same theory tested and rejected in *Boman*. But that court was clear that even notice of what could be considered "grooming" behavior was insufficient to render sexual abuse reasonably foreseeable. *Id.*

Accordingly, under either the voluntary assumption of duty theory, the special relationship theory, or the alleged heightened duty of care owed to minors, Plaintiff's negligence claim as to the BSA Defendants fails because she has not pleaded facts that make it plausible that the BSA Defendants' duty extended to protect her from the criminal acts of Drake and Bell specifically. *Babula*, 536 N.W.2d at 839.

In other words, even if the BSA Defendants were aware that Bell was perceived by his coworkers as having an inappropriately close relationship with Plaintiff, Plaintiff has not

alleged sufficient facts to overcome the foreseeability requirement mandated by *Babula*, *Brown*, and *Boman*. And finally, Plaintiff's general allegations that other young people have been abused during the seventy-year history of the Explorers program are not sufficient to render the harm caused in this case foreseeable because such facts, taken as true, do not establish a particularized threat or an imminent risk to her. *Brown*, 739 N.W.2d at 313.

Plaintiff also argues that policy considerations weigh in favor of finding that BSA had a duty to protect her from the specific type of harm she suffered. On this theory, Plaintiff relies on *Juarez v. Boy Scouts of America*, where a California court concluded that a duty existed under what Plaintiff views as very similar circumstances. 81 Cal. App. 4th 377 (Cal. Ct. App. 2000). There, a Boy Scout was molested by the volunteer scoutmaster for his troop. The *Juarez* court concluded that after a review of the relevant public policy considerations, the factors supported the imposition of a duty on the Boy Scouts to take reasonable protective measures to protect Boy Scouts from the risk of sexual abuse by adult volunteers involved in scouting programs under California law. *Id.* at 395.

The court also rejected the position that the sexual molestation of a Boy Scout was unforeseeable, based on a forty-year-old holding that "sexual molestation and assault by unknown third parties [were] foreseeable crimes from which children who are engaged in organized youth activities should be protected." *Id.* at 404 (citing *Wallace v. Der-Ohanian*, 199 Cal.App.2d 141 (1962).

The Court finds *Juarez* distinguishable on its facts and not persuasive in its application of law. First, there is a significant difference in a molestation committed by a scoutmaster who is vetted by the BSA and is expressly charged with protecting the scouts within his care

during planned programming. By contrast, Bell and Drake were full-time, on-call firefighters that had no affiliation with the BSA. Thus, Plaintiff implicitly argues for a significant extension of the theory of liability endorsed by *Juarez*; under her theory, youth organizations could be found negligent for failing to protect program participants from the criminal acts of unknown third parties for whom the youth organization has no control or relationship.

Moreover, the Court agrees with Defendants that "*Juarez* is out of step with Michigan law." That ruling, which relies in part of an assumption that sexual molestation and assault by unknown parties during organized youth activities *is foreseeable*, stands in stark contrast from the Michigan courts' understanding of the scope of the duty to protect from criminal activity, as illustrated in *Babula*, *Brown*, and *Boman*. The Court thus declines to follow *Juarez*.

In sum, Count Two of Plaintiff's complaint fails to state a claim because the criminal conduct of Drake and Bell was not foreseeable, and the BSA Defendants under Michigan law thus owed no duty to protect plaintiff.

### B. Vicarious Liability

Plaintiff seeks to hold BSA liable under various theories of vicarious liability in Count Three of her complaint. She alleges that Drake and Bell were agents of the BSA Defendants and can be held liable for their conduct. She also claims that BSA can be held vicariously liable for the alleged negligence of Cascade Township and its employees. These theories also fail as a matter of law.

First, as to the claims of vicarious liability for the acts of Drake and Bell, the general rule in Michigan is that an employer is not liable for the torts of its employees who act outside

the scope of their employment. Sexual assault, harassment, and molestation are "plainly beyond the scope" of an employee's relationship to his or her employer. *Zsigo v. Hurley Med. Ctr.*, 716 N.W.2d 220, 221 (Mich. 2006). There exists an exception to this general rule—the same exception that the Court has already examined in its discussion of *Brown*—that an employer's vicarious liability for the criminal acts of its employees is limited to those acts that it can reasonably foresee or reasonably should have foreseen. *Hamed v. Wayne County*, 803 N.W.2d 237, 245 (Mich. 2011) (citing *Brown*, 739 N.W.2d at 313). Thus, just as Plaintiff's direct negligence claims fail because the acts of Drake and Bell were not foreseeable, her vicarious liability claim must also fail, even assuming Drake and Bell were agents of BSA.

This conclusion also forecloses Plaintiff's theory that BSA could be vicariously liable because Drake and Bell were employees of Cascade, and BSA had formed a joint venture with Cascade. The factual allegations in Plaintiffs complaint are insufficient to draw a reasonable inference that Drake and Bell's criminal conduct was reasonably foreseeable to either BSA or Cascade. Thus, Plaintiff cannot rely on the exception of *Hamed* regardless of whether she pursues vicarious liability directly through Drake and Bell, or whether she attempts to channel the liability through Cascade.

Additionally, to the extent that Plaintiff seeks to hold the BSA Defendants liable for any constitutional tort committed by Cascade Township or its employees, that claim must also fail. It is well established that respondeat superior cannot be used to establish the liability of a municipality—*or a private entity*—where its agent committed the constitutional tort. *See, e.g., Savoie v. Martin*, 673 F.3d 488, 494 (6th Cir. 2012) (collecting cases). Plaintiff's theory

14

that her claim "relies on state law regarding vicarious liability for another's negligence and constitutional torts[]" runs squarely into this well-established federal law precluding such claims, and Plaintiff has not alleged that a policy or custom of the BSA was the moving force behind the deprivation of her rights as required for a claim under *Monell*. *See Miller v. Sanilac Cty.*, 606 F.3d 240, 255 (6th Cir. 2010) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)).

### C. Gross Negligence

Because Plaintiff's ordinary negligence claims fail, she cannot meet the elements of her claim for gross negligence. This claim will also be dismissed.

### IV. Conclusion

For the reasons just explained, Plaintiff has not pleaded facts which give rise to a plausible claim for relief as to the BSA Defendants, so their motion to dismiss will be granted.

### ORDER

For the reasons set forth above, the BSA Defendants' motion to dismiss is **GRANTED** and they are hereby **DISMISSED** from this action with prejudice.

**IT IS SO ORDERED.**

Date: July 23, 2019                                            /s/ Paul L. Maloney
                                                               Paul L. Maloney
                                                               United States District Judge